RONALD W. CHAPMAN II, *PHV*
MI Bar No. P73179
THE CHAPMAN FIRM
1300 Broadway St., FL 7
Detroit, Michigan 48226
T: (346) 242-7626
ron@chapmanandassociates.com

*Attorney for Defendant Kupetz*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

v.

1. Tyler Kontos,
2. Joel Max Kupetz, and
3. Jorge Kinds,

Defendants.

No. CR-25-00915-PHX-SMB

**DEFENDANT'S MOTION TO VACATE, OR IN THE ALTERNATIVE, TO MODIFY SEIZURE WARRANTS**

**(EXHIBIT FILED UNDER SEAL)**

Joel Max Kupetz ("Mr. Kupetz"), by and through undersigned counsel, hereby moves this Court to vacate, or alternatively modify, the seizure warrants issued in the above-captioned matter. These warrants, executed pre-indictment against multiple financial accounts associated with Mr. Kupetz, are overbroad and unsupported by probable cause.

For the reasons set forth in the attached memorandum of points and authorities, the Court should vacate the seizure warrants in their entirety. In the alternative, Mr. Kupetz respectfully requests that the Court modify the warrants or their execution to release all untainted assets and convert any remaining restraints to temporary protective orders under § 853(e), preserving the status quo without dispossession of property.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND FACTUAL BACKGROUND

On June 17, 2025, federal agents obtained and executed *ex parte* seizure warrants against three accounts connected to Mr. Kupetz, effectively freezing and removing funds totaling approximately $6.4 million across these accounts.[1] These accounts—which include:

1. U.S. Bank Account x6205 ("Target Account 4")—A U.S. Bank account held in the name of Joel M. Kupetz and Karma Medical Consulting LLC, identified in the warrant as Target Account 4. *See* Ex. A, at ¶¶ 73–75.
2. Charles Schwab Account x1792 ("Target Account 5")—A Charles Schwab investment/brokerage account in the name of Joel Kupetz,.identified in the warrant as Target Account 5. *Id.* at ¶¶ 76–78.
3. Coinbase Account b807 ("Target Account 6")—a Coinbase cryptocurrency exchange account with unique ID ending in b807 identified in the warrant as Target Account 6). *Id.* at ¶¶ 79–84.

These funds were seized from the designated "Target" accounts as part of a pre-indictment investigation into an alleged health care fraud and money laundering scheme, while other accounts—including a personal account ("WF x0920") and business account affiliated with Mr. Kupetz held under the name "Karma Medical Consulting, LLC" ("Karma x9331")—were referenced in the warrant affidavit as intermediary or source accounts used to fund the Target Accounts. *Id.* ¶¶ 64–71. At the time of seizure, no criminal indictment or civil forfeiture complaint had yet been filed against Mr. Kupetz. The warrants were issued upon a sealed affidavit by a Government agent, who averred that the funds in these accounts were subject to forfeiture as proceeds of unlawful activity (or as property "involved in" money laundering transactions, *see id.* ¶ 93).

The affidavit, however, provided only broad and conclusory statements about the accounts' relationship to the alleged offenses. It failed to delineate which specific deposits

[1] *See* Exhibit A, Seizure Warrants and Affidavits for Target Accounts 4, 5, and 6.

or portions of each account's balance were traceable to criminal conduct, and it made no distinction between genuinely tainted funds and those derived from Mr. Kupetz's legitimate sources of income or assets acquired long before the alleged scheme. In several instances, the accounts contained substantial pre-existing balances and funds transferred from unrelated, untainted accounts, as well as earnings (such as investment gains or interest) that accrued independently of any criminal activity. Nonetheless, the Government sought and obtained blanket seizure of all funds in each account, without exclusion of the clear portion of untainted assets.

Notably, the affidavit also lacked any *particularized explanation* as to why such total and immediate seizures were necessary to preserve the property for forfeiture.

Federal law permits pre-indictment restraint of assets through a narrowly tailored restraining order under 21 U.S.C. § 853(e) when necessary; seizure warrants (which are far more intrusive, transferring custody of the property to the Government) may only be used instead if the Government demonstrates that a restraining order or injunction would be insufficient. *See* Ex. A, ¶¶ 90-91.

Here, the Government's application offered no specific facts showing that Mr. Kupetz would dissipate or hide assets if notified, nor any evidence that lesser measures (like freezing the accounts in place or obtaining a lis pendens on any real property) would fail to secure the assets.

By proceeding directly to full seizures without that showing, the Government violated the statutory prerequisite of § 853(f) and deprived Mr. Kupetz of property without the procedural safeguard Congress mandated.

The seized funds are overwhelmingly innocuous: they include revenues from legitimate business activities, personal savings and salary deposited over time, funds rolled over from earlier accounts, and appreciation of lawfully obtained assets.

To date, the Government has not identified any specific transactions definitively linking the seized monies to unlawful conduct, nor has it commenced any judicial forfeiture proceeding where Mr. Kupetz could contest the forfeitability of these assets. The continued

retention of his property under these circumstances is causing significant hardship—effectively immobilizing resources that Mr. Kupetz needs for his ordinary living expenses and legal defense, and is tarnishing the businesses associated with the accounts.

Accordingly, Mr. Kupetz brings this motion to challenge the legality of the seizure warrants. In the sections that follow, he will show that:

(1) The warrants were issued without probable cause as to each account and are overbroad, because the supporting affidavit failed to trace criminal proceeds to the seized funds and instead impermissibly treated commingled accounts as wholly forfeitable;

(2) The Government's application did not satisfy § 853(f)'s requirement to show why less restrictive restraining orders were inadequate, rendering the seizures unlawful;

(3) The seizures offend the Fourth Amendment's particularity and probable cause requirements by sweeping in untainted assets without specific justification;

(4) The scope of these seizures, if left uncorrected, would violate the Excessive Fines Clause of the Eighth Amendment, as the value seized is grossly disproportionate to the legitimate penalties or forfeitable proceeds in this matter. *United States v. Bajakajian*, 524 U. S. 321, 334 (1998).

Finally, Mr. Kupetz requests that, at minimum, this Court order the immediate return of clearly untainted funds and convert any necessary restraints to temporary orders under § 853(e), which would preserve the status quo without continuing to inflict the irreparable harm of a total asset deprivation.

## II. ARGUMENT

### 1. <u>The Seizure Warrants Are Overbroad and Lack Probable Cause for Each Account Being Seized.</u>

The Fourth Amendment demands that warrants—including seizure warrants for property alleged to be forfeitable—may issue only upon a showing of probable cause and "particularly describ[e]. . . .the. . . .things to be seized." U.S. Const. amend. IV. These seizure warrants fail that fundamental test. Rather than limit the seizure to specific sums or transactions supported by evidence of criminal taint, the warrants authorized the wholesale

confiscation of entire accounts without differentiating clean from dirty funds. The Government's affidavit did not establish probable cause to believe that *all* funds in each targeted account were forfeitable. At most, it alleged that certain deposits *into* the accounts (or transfers between them) were derived from the suspect health-care business operations. But it offered no tracing analysis to segregate those suspect deposits from the many other innocent sources of funds in the same accounts. Where law enforcement seeks to seize commingled accounts containing both tainted and untainted funds, it is incumbent on the Government to demonstrate a nexus between the offense and the specific property to be seized.

A warrant that indiscriminately seizes all assets in an account—without probable cause that the entire balance is criminally derived or involved—is an unconstitutional general warrant, void for overbreadth.

Here, the Government's approach essentially presumes that if an account *ever* received any criminal proceeds, then *everything* in that account is fair game.

That is not the law.

Courts have long recognized that money is fungible, and when illicit funds are mixed with legitimate funds, the Government must do more than simply point to the commingling as a basis to forfeit everything. In *United States v. Voigt*, 89 F.3d 1050, 1087–88 (3d Cir. 1996), for example, the Third Circuit overturned a broad forfeiture where the government failed to trace proceeds within a commingled account. The Court emphasized that forfeiture statutes requiring property "traceable to" an offense demand actual tracing of the tainted portion; if the government cannot distinguish criminal proceeds from legitimate funds, it cannot just designate the entire account as forfeitable—instead, it must rely on substitute asset provisions to recover an equivalent value after conviction. *Id.* The Government's attempt to short-circuit tracing in this case mirrors the strategy rejected in *Voigt*.

Likewise, the Eleventh Circuit has squarely held that bank accounts containing commingled criminal and non-criminal funds are not automatically subject to blanket

forfeiture as "proceeds." In *In re Rothstein, Rosenfeldt, Adler, P.A. (United States v. Rothstein)*, 717 F.3d 1205, 1212–14 (11th Cir. 2013), the court refused to allow the forfeiture of an entire attorney trust account that had commingled Ponzi scheme money with legitimate client funds; it applied *Voigt*'s rule and vacated the seizure of the commingled account, requiring the Government to separate tainted from untainted monies. *Id.* These authorities make clear that the Government must connect the dots between the alleged crime and the specific assets seized. A mere showing that some unlawful money flowed *through* an account at some point is not enough to seize everything in it.

In the instant case, the affidavit's probable cause showing is deficient with respect to each targeted account, as detailed below:

a. **U.S. Bank Account (Target Account 4):** According to the affidavit, this U.S. Bank account is another account under Mr. Kupetz's control that allegedly commingled funds from the Karma x9331 account. *Id.* ¶¶ 73-75. Mr. Kupetz used the U.S. Bank account for legitimate personal or business transactions (to be specified with evidence at a hearing). The Government might claim that some Medicare reimbursements or illegal kickbacks were deposited here; however, it failed to quantify or trace. The warrant application did not establish what portion of the accounts' balance was derived from any unlawful scheme. The Fourth Amendment does not countenance such dragnet seizures of mixed property. Without particularized probable cause that the specific dollars taken were linked to crime, the seizure warrant for the U.S. Bank account cannot stand.

b. **Charles Schwab Brokerage Account (Target Account 5):** The seizure of the Schwab account is especially suspect because brokerage accounts often contain diverse assets (stocks, bonds, mutual funds) acquired over a long period, some of which may have greatly appreciated. Mr. Kupetz's Schwab account, upon information and belief, included investments that predate the alleged offenses and gains that accrued due to market conditions. *Id.* ¶¶ 76-78. The affidavit baldly concludes that this account is subject to forfeiture because it was allegedly for "laundering" proceeds—presumably

under a theory that Mr. Kupetz transferred some money from a business account into the brokerage account or purchased securities with tainted funds. *Id.* ¶ 78. But crucially, the Government identifies no specific *criminal* proceeds that were invested. Even if one deposit into the account years ago included fraud-derived dollars, the account also contained Mr. Kupetz's legitimate portfolio. Suppose, for example, that $100,000 of tainted funds were invested alongside $200,000 of Mr. Kupetz's lawful money—and that through successful investments the account grew to $500,000. The Government cannot simply grab the entire half-million without showing which portion is traceable to wrongdoing. In fact, even the $100,000 initial dirty money would not justify forfeiting the full $500,000 with all gains, absent evidence that the appreciation itself was causally related to criminal use of the account. Market gains and dividends on clean money are not "proceeds" of crime. The affidavit's silence on these issues is fatal to probable cause. It offers no method of tracing and no rationale why the entirety of the Schwab account should be considered criminal. Seizing the whole account was therefore unreasonable and overbroad.

c. **Coinbase Cryptocurrency Account (Target Account 6):** The Coinbase account seizure is another instance of overreach due to lack of tracing. Cryptocurrencies held by Mr. Kupetz should not be presumed criminal simply because they exist. The affidavit suggests that Mr. Kupetz converted some funds into cryptocurrency or received crypto assets during the relevant period. *Id.* ¶¶ 79-84. But it provides no detail on the source of the crypto holdings. Mr. Kupetz has been an early adopter of cryptocurrency and had accumulated Bitcoin and other assets in this Coinbase account through legitimate means (including earlier purchases with lawful funds, and market appreciation of those crypto assets over time). For example, if he bought Bitcoin in 2017 with clean money and it increased in value, that gain is not illicit. The Government's affidavit fails to show that any particular crypto assets seized are directly traceable to fraudulent proceeds. Moreover, the warrant bizarrely identifies the account by a long hexadecimal ID (perhaps a wallet address or internal Coinbase identifier) and labels it as "Target

Account 6," but does not articulate why all contents of that wallet/account are forfeitable. Seizing the entirety of the Coinbase account—which might include a mix of coins from different sources and dates—without a tracing analysis is as unjustified as seizing an entire bank account. Cryptocurrency is *fungible* like cash; the Government must demonstrate that the specific tokens or their equivalent value were involved in or derived from criminal transactions. It has not done so. Therefore, the blanket seizure of the Coinbase account was not supported by probable cause tailored to the assets seized.

In sum, for each account, the Government's showing amounted to a generic assertion that Mr. Kupetz had engaged in fraud and money laundering, coupled with the fact that these accounts were under his control and had received transfers during the period of interest. That is a far cry from probable cause that the funds in the accounts are forfeitable. The warrants thus functioned as general warrants, seizing lawfully obtained property alongside any allegedly unlawful proceeds. This exceeds constitutional bounds. The appropriate remedy is to vacate the seizure warrants in full, or at least to limit them only to those funds as to which the Government can make a specific showing of traceability to criminal conduct (and as discussed below, even that should be handled via less restrictive means pending trial).

**2. <u>The Government Failed to Satisfy 21 U.S.C. § 853(f)'s Requirements for Pre-Indictment Seizure Warrants.</u>**

Even setting aside the Fourth Amendment issues, the seizure warrants must be vacated because the Government did not fulfill the statutory preconditions for obtaining such warrants. The authority to seek a pre-indictment criminal forfeiture seizure derives from 21 U.S.C. § 853(f), which provides that a court "*shall*" issue a seizure warrant for property subject to forfeiture *only if* it finds probable cause to believe the property would be forfeitable and that "an order under subsection (e) [*i.e.*, a restraining order or injunction] may not be sufficient to assure the availability of the property for forfeiture" 21 U.S.C. § 853(f). In other words, Congress built a strong preference for using less intrusive restraining orders to preserve assets in place and allowed outright seizures (which transfer

possession to the Government) only upon a specific showing that a restraining order would be inadequate. The legislative logic is clear: a restraining order under § 853(e) freezes the property but leaves it in the owner's custody (or at least does not dispossess the owner) and usually provides the owner notice and an opportunity to be heard if the restraint is to continue. This is less onerous on the owner's rights and still protects the Government's interest. Seizure without notice, however, is a drastic measure—justified only if necessary to thwart a real risk of asset flight, destruction, or non-compliance with a mere freeze.

In its applications for the warrants, here the Government made no particularized demonstration that a restraining order would have been insufficient. The affidavit is devoid of facts indicating that Mr. Kupetz was likely to dissipate or hide the assets if merely restrained. There is no allegation, for instance, that Mr. Kupetz attempted to withdraw or transfer large sums once he became aware of the investigation, or that he has a history of secreting assets. Nor did the Government present evidence that any third parties were likely to abscond with the funds. Instead, any argument about the need for seizure appears to have been generic and speculative. Such conjecture is not enough. Courts have expressly held that a conclusory assertion of risk, or an agent's "guess" about what a defendant *might* do, will not satisfy § 853(f)'s requirement.

For example, in *United States v. Walker*, 943 F. Supp. 1326, 1330–31 (D. Colo. 1996), the court denied a pre-indictment seizure where the government's showing of necessity was based on nothing more than an agent's speculation that the targets could flee the country with assets; the court found this insufficient to establish that a restraining order wouldn't work. Similarly, in *In re 2000 White Mercedes ML320,* 220 F. Supp. 2d 1322, 1325–26 (M.D. Fla. 2001), the court quashed a § 853(f) seizure because the government failed to make the required showing that a restraining order would be insufficient. These cases underscore that the government must present concrete reasons why notifying the defendant and freezing assets in place would likely result in the assets' loss or destruction.

Here, rather than detailing any such reason, the Government leapt straight to seizure. It did so despite obvious, less harsh alternatives. For instance, for bank and brokerage

accounts, a restraining order served on the financial institution could have simply prohibited any withdrawals or transfers beyond basic living expenses, thereby preserving the funds. Banks regularly comply with court-ordered asset freezes, and there was no indication that any bank would refuse or that Mr. Kupetz would have been able to circumvent such an order. With respect to the cryptocurrency, Coinbase (a U.S.-based exchange) likewise can and does implement account freezes when presented with court orders. The Government could have obtained a § 853(e) restraining order directed at Coinbase to lock down the account (preventing Mr. Kupetz from moving the crypto), which would have achieved the same preservation goal. Indeed, in cases involving easily movable assets, such as cash or crypto, courts have noted that the § 853(f) "not sufficient" prong can be met by showing a risk of dissipation—but that showing still must rest on more than the *inherent* nature of the asset; it should be grounded in the behavior of the defendant or specific facts (*e.g.*, an attempt to liquidate funds). No such individualized facts were offered here.

Because the Government did not carry its burden under § 853(f), the magistrate judge lacked statutory authority to issue these seizure warrants. They were improvidently granted. The proper remedy is vacatur of the warrants and return of the property to the status quo ante, subject to any appropriate restraining orders that the Court may deem necessary under § 853(e). This outcome would not undermine the Government's interests—the assets can still be secured via a freeze—but it would correct the excessive and premature deprivation of Mr. Kupetz's property. Congress intended restraining orders to be the first resort in exactly these circumstances; bypassing that mechanism was improper.

**3. The Seizures Violate the Fourth Amendment: Lack Of Particularity and Overbreadth.**

The Fourth Amendment's particularity requirement is a bulwark against general warrants—against exactly the kind of broad financial dragnet that was conducted here. Warrants must *particularly describe* the property to be seized and be supported by probable

cause focused on that property. The warrants for Mr. Kupetz's accounts plainly violated these principles by authorizing the seizure of entire accounts without limitation.

A warrant that authorizes seizing all funds on deposit in an account, when only a fraction of those funds are suspected criminal proceeds, is analogous to a warrant allowing the seizure of an entire house when only one room contains contraband. It is overbroad on its face.

Here, the warrants' lack of particularity effectively relieved the Government of its duty to distinguish tainted from untainted property. That is unconstitutional. The Supreme Court has made clear that general warrants—those not grounded in careful, specific probable cause—are impermissible (*see*, *e.g.*, *Marron v. United States*, 275 U.S. 192, 195–96 (1927), warning against warrants that leave the executing officers too much discretion as to what to take). By seizing all assets in multi-use accounts, the Government wielded precisely such unfettered discretion.

Moreover, the probable cause underpinning these warrants was not only unspecific, as discussed in Section I, but in some respects nonexistent. For example, the seizure of legitimate funds present in the accounts well before any alleged crime. There can be no probable cause to believe those particular funds are forfeitable, since by definition they were not derived from the crime nor involved in it. Taking those funds is equivalent to an unreasonable seizure of property without any crime connection—essentially a Fourth Amendment seizure with zero justification. The inclusion of those funds in the warrant's scope renders the warrant invalid at least to that extent. And because the warrant did not segregate or specify which funds to seize, it lacked the requisite particularity. The executing agents had no judicially guided limit on what to take—they took everything.

The Government might argue that because money is fungible, a warrant must seize the whole account to capture the criminal dollars. But fungibility is exactly why rigorous tracing and particularity are required; otherwise, the Government can bootstrap a small suspicion into a total forfeiture. Indeed, if the Government truly believed only a certain portion was traceable, it could have sought a warrant or order to seize a specific amount

from the account. That at least would cap the intrusion to the amount of suspected dirty money. Here, no such cap was observed.

In sum, the sweeping seizures violated Mr. Kupetz's Fourth Amendment rights. The proper remedy is suppression of the fruits of those unlawful seizures and the return of the property. While suppression typically applies to evidence, in the context of a motion to vacate a seizure warrant, the analogous relief is to nullify the warrant and compel the Government to undo the seizure (for instance, by depositing the funds back into the accounts or otherwise releasing them to Mr. Kupetz). The Court should so order.

**4. <u>The Continued Deprivation of Mr. Kupetz's Property Without a Prompt Hearing Violates Due Process Under the Fifth Amendment.</u>**

Even if the initial *ex parte* seizures had been technically lawful, the ongoing retention of Mr. Kupetz's assets without affording him a timely, meaningful opportunity to contest the basis for forfeiture raises serious due process concerns. The Fifth Amendment's Due Process Clause guarantees that the Government cannot deprive an individual of property without fundamentally fair procedures. When the Government seizes property, due process typically requires notice and some chance for the owner to be heard at a meaningful time and in a meaningful manner.

**a. No Pre-Seizure Notice or Hearing**

In the case of ordinary property (as opposed to real estate), courts have permitted *ex parte* seizures at the outset, recognizing that advance notice could enable a person to hide or spend the assets. However, the Supreme Court has drawn an important distinction for certain types of property. In *United States v. James Daniel Good Real Property*, 510 U.S. 43, 62–63 (1993), the Court held that, absent exigent circumstances, the owner of real property is entitled to notice and a hearing before the property is seized by the government. Although that case involved a home (which is not easily moved), its reasoning underscores a broader point: where the government's interest in prompt seizure is not compelling, and the property can be secured through less intrusive means, the Constitution favors giving the owner a chance to contest the taking beforehand. *Id.* In Mr. Kupetz's situation, the

Government had options (like restraining orders) that would have preserved the assets without a surprise seizure; by choosing the more draconian route, the Government bypassed the usual procedural protections. While *James Daniel Good* dealt with real property, the question must be asked: what justification existed here for not at least giving Mr. Kupetz a prompt post-seizure process, once the initial seizure had occurred?

**b. Delay and Lack of Post-Seizure Hearing**

In *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Supreme Court explained that due process is flexible and calls for such procedural safeguards as the situation demands, analyzing factors like the private interest at stake, the risk of erroneous deprivation, and the Government's interest. Here, Mr. Kupetz's interest in access to his lawfully acquired property (including funds needed for his family's living expenses and to retain counsel of choice) is paramount. The risk of erroneous deprivation is extremely high—as detailed, the Government's case for forfeiture is tenuous and overbroad, meaning there is a significant chance that a large portion of the seized money is not forfeitable at all.

On the other side, the Government's interest in holding of the assets without a hearing is low; a hearing would not suddenly allow the assets to vanish if the court ensures reasonable safeguards. The current situation also implicates the principle recognized in *United States v. $8,850*, 461 U.S. 555, 564–66 (1983). In that case, the Supreme Court addressed the due process implications of the Government's delay in instituting forfeiture proceedings after seizing property, and established a test (considering length of delay, reason for delay, the claimant's assertion of rights, and prejudice). *Id.*

Although *$8,850* was about a delay of 18 months in filing a forfeiture case, the similarities are evident: Mr. Kupetz's assets have been held for months before the case was filed, he is prejudiced by the inability to use his money. The clock is ticking on due process, and by any reasonable measure, Mr. Kupetz is entitled *now* to contest the seizure rather than wait indefinitely for the Government's litigation timeline. By failing to promptly initiate a proceeding or provide a mechanism (such as an adversarial probable cause

hearing or a *Monsanto or Luis* hearing for release of untainted assets for fees), the Government has effectively denied due process.

**c. Impact on Sixth Amendment Right to Counsel**

While not his primary basis for relief, one cannot ignore that the seizure of untainted funds has an overlapping effect on Mr. Kupetz's Sixth Amendment right to counsel of choice. The Supreme Court held in *Luis v. United States*, 578 U.S. 5, 11–12 (2016), that pretrial restraint of a defendant's own innocent property—assets not traceable to a crime—which are needed to hire defense counsel violates the Sixth Amendment.

Here, if any portion of Mr. Kupetz's seized funds is untainted (as he strongly argues it is), then under *Luis* he has a constitutional right to use that portion to pay for his defense. The Government's blanket seizure order did not carve out any exception for attorneys' fees or living expenses. Nor has the Government offered to do so after the fact. This compounds the due process problem: it transforms a provisional measure intended to safeguard potential forfeiture into a weapon impairing Mr. Kupetz's ability to defend himself in any forthcoming criminal case. While *Luis* dealt with a restraining order, the principle applies even more when the government actually takes hold of the assets. This Court should not countenance a scenario where Mr. Kupetz is left hamstrung—unable to pay counsel or meet basic needs—all before the Government has even proven any wrongdoing.

At a minimum, due process requires that Mr. Kupetz be given a prompt post-seizure hearing where the Government must justify the continued freeze on each asset. The Court has the power to order such a hearing (often called a post-restraint probable cause hearing or a *Monsanto* hearing in indicted cases, after *United States v. Monsanto*, 491 U.S. 600 (1989)). Mr. Kupetz urges the Court to do so if it does not outright vacate the warrants. In that hearing, the Government should bear the burden of showing that probable cause exists to believe each asset is forfeitable and that no less restrictive condition (like a partial release or bond) could protect its interests. Mr. Kupetz is prepared to demonstrate the lawful origins of a significant portion of the seized funds and to contest the Government's assertions on any allegedly tainted portion. Due process entitles him to that opportunity

now, not months or years later after protracted litigation.

**5. <u>The Seizures Impose an Excessive Fine in Violation of the Eighth Amendment.</u>**

The Eighth Amendment's Excessive Fines Clause limits the Government's power to extract or confiscate assets as punishment for an offense. Even if forfeiture is statutorily authorized, it cannot be grossly disproportional to the gravity of the defendant's offense. In *United States v. Bajakajian*, 524 U.S. 321, 334 (1998), the Supreme Court held that a forfeiture that is "grossly disproportional to the gravity of a defendant's offense" is unconstitutional. There, the Court struck down the forfeiture of $357,144 from a defendant who failed to report transporting that currency, because the offense was merely a reporting violation and the money itself was legally earned; taking it all was excessive relative to the offense. *Id.* The *Bajakajian* decision established that courts must evaluate, *inter alia*, the nature and extent of the crime, whether the forfeiture would deprive the offender of their livelihood, the harm caused, and how the forfeiture compares to penalties in similar cases.

Although no indictment was filed in Mr. Kupetz's case at the time the warrants were executed, the breadth of the seizures suggests the Government ultimately seeks forfeiture of the order of $6.4 million (the total amount last reported in the accounts that were seized) from him. It is important to note that this amount may far exceed both Mr. Kupetz's personal gain from any alleged wrongdoing and any conceivable fines or guidelines-level forfeiture that would apply if he were convicted. Moreover, forfeiting funds that are not actually the product of the offense turns the forfeiture into a punitive sanction untethered to the offense, exactly the scenario the Excessive Fines Clause guards against.

At this juncture, because Mr. Kupetz asserts that a substantial portion of the seized assets are untainted or bear only an attenuated connection to the offense, their forfeiture would amount to an excessive fine. Even to the extent some portion is arguably connected, the forfeiture of everything goes well beyond remedial or compensatory purposes and enters the realm of punitive destruction of Mr. Kupetz's wealth. This is particularly true if the seizure forces Mr. Kupetz into financial ruin or bankruptcy—a consequence far out of proportion with the allegations against him, which (while serious if proven) are economic

crimes that usually warrant forfeiture of the illicit gain, not of one's entire lawful estate.

Mr. Kupetz urges the Court to consider the proportionality early, now, in assessing whether the seizures should be curtailed. Continuing to hold all these assets is not just unauthorized; it may be unconstitutional. The Eighth Amendment can thus inform this Court's equitable authority to release property. Indeed, it would be an empty exercise to force Mr. Kupetz to await final adjudication to get back funds that the Government should never be allowed to forfeit in the first place. By addressing the issue now, the Court prevents ongoing harm from an excessive (and thus unconstitutional) pretrial fine. In practical terms, the Excessive Fines Clause supports the relief requested: return of untainted or disproportionate assets and limitation of any restraint to amounts commensurate with the alleged offense.

**6. Requested Relief: Return of Untainted Property and/or Conversion of Seizures to Temporary Restraining Orders under § 853(e).**

For the foregoing reasons, Mr. Kupetz respectfully requests that the Court vacate the seizure warrants in their entirety. This would result in the immediate release of all funds and assets seized from the three target accounts. Such relief is warranted because the warrants were unlawfully issued and executed, and the status quo ante should be restored. Once the assets are returned, the Government—if it still seeks to preserve them for potential forfeiture—can move under 21 U.S.C. § 853(e) for a restraining order, which Mr. Kupetz would not oppose *so long as* it is appropriately narrow and allows for the exclusion of untainted assets or funds necessary for reasonable living expenses and attorney fees.

Alternatively, if the Court is not inclined to vacate outright, Mr. Kupetz requests, in the alternative, that the Court exercise its authority to modify the seizure warrants or the conditions of custody of the assets. Specifically, the Court could order that all seized funds be placed back into the original accounts (or a Court-controlled escrow), but subject to a restraining order under § 853(e) forbidding Mr. Kupetz from removing or dissipating them (except as permitted by the Court for ordinary expenses). This alternative essentially converts the situation into a freeze rather than a possession by the Government. It would

ameliorate many of the due process and Sixth Amendment concerns by allowing Mr. Kupetz access upon motion for necessary expenditures, and it would still secure the funds for the Government pending resolution of the case. The statute explicitly contemplates that a restraining order can be used instead of seizure pre-indictment, and that route was bypassed here; the Court can correct that by now imposing a restraining order in lieu of continued seizure.

Furthermore, Mr. Kupetz asks that the Court direct the Government to identify and return all assets that are not traceable to the alleged offenses. The Government's own policies dictate that forfeiture should not reach innocent property. The Court could require the Government to particularize its tracing theory for each account, and any funds outside that theory should be released.

Lastly, Mr. Kupetz requests that the Court schedule a post-seizure hearing at the earliest possible date, where evidence and witness testimony can be presented regarding the nature of the funds. At such a hearing, the Government should have the burden to show continuing probable cause to keep the restraint (especially for any assets he claims are untainted), and Mr. Kupetz should be permitted to rebut with his own evidence. This process would ensure no asset remains frozen without ongoing justification.

## III. CONCLUSION

For the reasons set forth above, Mr. Kupetz respectfully requests that the Court grant this motion and order the immediate vacatur of the seizure warrants. In the alternative, he requests that the Court modify the warrants to release all untainted funds and impose a less-restrictive restraining order to secure any arguably tainted funds, with provisions for Mr. Kupetz's reasonable access to assets for life necessities and legal fees. Such relief will protect Mr. Kupetz's constitutional rights while still preserving the Government's ability to pursue forfeiture of any truly illicit proceeds in the proper forum and at the proper time.

Dated: December 31, 2025

Respectfully submitted,

s/ *Ronald W. Chapman II*
Ronald W. Chapman II

*Attorney for Defendant Kupetz*

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was electronically filed on December 31, 2025. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. I further certify that the accompanying exhibit filed under seal was sent to counsel for the Government and co-defendants Kontos and Kinds.

s/ *Ronald W. Chapman II*
Ronald W. Chapman II