RONALD W. CHAPMAN II, *PHV*
MI Bar No. P73179
THE CHAPMAN FIRM
1300 Broadway St., FL 7
Detroit, Michigan 48226
T: (346) 242-7626
ron@chapmanandassociates.com

*Attorney for Defendant Kupetz*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

v.

1. Tyler Kontos,
2. Joel Max Kupetz, and
3. Jorge Kinds,

Defendants.

No. CR-25-00915-PHX-SMB

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO VACATE, OR IN THE ALTERNATIVE, TO MODIFY SEIZURE WARRANTS**

## I. INTRODUCTION

The United States' response confirms that the seizure warrants swept far beyond what the Fourth Amendment and 21 U.S.C. § 853(f) permit. The Government now concedes it seized at least two discrete, identifiable amounts of preexisting property that it itself labels "non-criminal proceeds": (1) $277,210.34 transferred into the Schwab account when it was opened (**Target Account 5**), and (2) cryptocurrency valued at approximately $47,605.11 already held in the Coinbase wallet before any alleged proceeds were deposited (**Target Account 6**). (ECF No. 60 at 12–13.) Yet the Government insists those admitted, pre-offense funds are forfeitable merely because alleged proceeds later entered the same accounts. (*Id.* at 14–17.) That position would convert money-laundering forfeiture into an end-run around tracing, substitute-asset limits, and the particularity requirement.

Equally fundamental, the Government continues to label every payment Mr. Kupetz received from Apex and Viking as an "illegal kickback" without establishing the elements of an Anti-Kickback Statute ("AKS") offense. The Government's own narrative describes Mr. Kupetz as a medically untrained marketer. (*Id.* at 3.) It does not allege he prescribed anything, made clinical decisions, or had authority to order products for reimbursement. At most, the affidavit alleges he "pressured" nurse practitioners to use larger grafts. (*Id.* at 4.) Pressure is not a statutory element of 42 U.S.C. § 1320a-7b(b), and aggressive marketing is not a federal felony. Recent Seventh Circuit authority confirms that AKS liability turns on remuneration intended to induce referrals by persons in a position to exercise decision-making power or influence over federally reimbursed healthcare decisions—not payments for marketing to persons who cannot make referrals and do not decide whether an item will be ordered or billed. *See United States v. Sorensen*, 134 F.4th 493, 496–97 (7th Cir. 2025).

Because the Government failed to satisfy § 853(f)'s statutory prerequisite that a § 853(e) restraining order "may not be sufficient," and because it has not shown particularized probable cause tying the seized "untainted" property to any forfeitable theory, the Court should vacate the seizure warrants and order return of the property. At a minimum, the Court should modify the seizures to immediately release the Government-identified untainted amounts and convert any remaining restraint to a narrowly tailored § 853(e) protective order served on the relevant financial institutions.

## II. THIS IS A STATUTORY AND FOURTH AMENDMENT CHALLENGE TO THE SEIZURE WARRANTS—NOT A POST-TRIAL FORFEITURE DISPUTE

The Government attempts to reframe the motion as a premature Rule 41(g) request that can be litigated only after conviction. (ECF No. 60 at 8–10.) That misstates both the motion and the governing statute. Mr. Kupetz challenges whether the Government was entitled to seize (*i.e.*, dispossess) property *ex parte* through warrants issued under § 853(f), rather than preserve property through less intrusive means. Section 853(f) authorizes a

seizure warrant only when the court finds both probable cause that the property would be forfeitable and that "an order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture." 21 U.S.C. § 853(f). Whether that prerequisite was met is a question for the Court now; it is not deferred until sentencing.

## III. THE GOVERNMENT DID NOT SATISFY § 853(f)'S "MAY NOT BE SUFFICIENT" REQUIREMENT

Congress made seizure by warrant the exception, not the rule. Under § 853(f), the Government must do more than invoke the general proposition that money is fungible. It must present case-specific facts showing why a less intrusive restraining order would likely fail to preserve availability. Courts have rejected § 853(f) applications grounded in speculation or boilerplate assertions untethered to a defendant's conduct. *See United States v. Walker*, 943 F. Supp. 1326, 1330–31 (D. Colo. 1996); *In re 2000 White Mercedes ML320*, 220 F. Supp. 2d 1322, 1325–26 (M.D. Fla. 2001).

The Government's response relies on three points: (1) Agent Ingram's generic "training and experience" statements that banks sometimes implement restraints imperfectly; (2) the inherent transferability of bank accounts and cryptocurrency; and (3) the alleged depletion of a separate account (**Target Account 4**) before any restraint was in place. (ECF No. 60 at 18–21.) None is a substitute for § 853(f)'s required showing.

First, "training and experience" assertions about what "sometimes" happens cannot satisfy a statutory prerequisite that demands a concrete showing that a restraining order "may not be sufficient" in this case. If generalized concerns about administrative delay at a bank were enough, § 853(f)'s second prong would be meaningless, and seizure would become the default in every white-collar case. Second, the Government does not explain why a promptly issued protective order—served directly on Schwab and Coinbase—would not freeze withdrawals and transfers just as effectively without dispossessing Mr. Kupetz. Third, the asserted depletion of **Target Account 4** proves only that money can be spent when there is no restraint; it does not show that a restraining order would have been ineffective once imposed.

The out-of-circuit district cases the Government cites (*e.g.*, *United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011)) do not alter the statute's text. (ECF No. 60 at 19.) Even assuming a warrant need not contain an explicit written finding, the Government still must make the showing in the affidavit. Here, it did not. Because § 853(f)'s prerequisite was not met, the seizure warrants should be vacated and replaced, if necessary, with a narrowly tailored § 853(e) restraining order.

## IV. THE GOVERNMENT HAS NOT SHOWN PROBABLE CAUSE THAT MR. KUPETZ'S COMPENSATION WAS AN "ILLEGAL KICKBACK"

The seizure warrants (and the Government's response) repeatedly label the money Mr. Kupetz received from Apex and Viking as "kickbacks." (Aff. ¶¶ 6–7, 25–27, 32, 64–68; ECF No. 60 at 3–4, 10–12). That label is doing nearly all the work: it supplies the "specified unlawful activity," supplies the "criminally derived property" element for 18 U.S.C. § 1957, and supplies the "proceeds" theory for 18 U.S.C. § 982(a)(7). But conclusory labeling is not probable cause. *Illinois v. Gates* requires a "substantial basis" to conclude property is connected to crime. 462 U.S. 213, 236 (1983).

The Anti-Kickback Statute requires proof that remuneration was knowingly and willfully offered, paid, solicited, or received "to induce" or "in return for" referrals or the ordering of items or services reimbursable under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(1)–(2). Here, the Government's own summary describes Mr. Kupetz as a "medically untrained" sales representative. (ECF No. 60 at 3–4.) The only specific conduct alleged as to Mr. Kupetz is that he identified potential patients, recommended grafts, and "pressured" nurse practitioners to apply larger grafts. (*Id.* at 4.) Nothing in that description establishes a quid pro quo exchange of remuneration for referrals by a person with referral authority or decision-making power.

The Seventh Circuit's published decision in *United States v. Sorensen* illustrates the point. There, the Government tried to extend AKS liability to payments made to advertising and marketing companies that generated patient leads for Medicare-reimbursed orthopedic braces. *Sorensen*, 134 F.4th at 496–97. The Seventh Circuit reversed for insufficient

evidence, emphasizing that the payees were "advertisers" and not "physicians … or other decisionmakers" with the ability to leverage influence over healthcare decisions; physicians retained discretion to sign or ignore prescriptions. *Id.* The same structural defect exists here. Nurse practitioners—independent medical professionals—made the medical and billing decisions. The Government does not allege that Mr. Kupetz could compel prescribing, could submit claims, or could decide what Medicare would reimburse.

*Sorensen* is persuasive authority, but the core point is statutory: AKS is not a federal ban on aggressive sales tactics or commission-based marketing. At minimum, the Government has not shown probable cause that every payment to Mr. Kupetz was criminally derived property, as opposed to compensation for marketing services. Without that predicate, the Government cannot treat all subsequent deposits and investments as proceeds of "specified unlawful activity."

## V. THE GOVERNMENT'S COMMINGLING THEORY CANNOT JUSTIFY SEIZURE OF IDENTIFIABLE, PREEXISTING UNTAINTED PROPERTY

The Government's commingling theory is simple: once alleged proceeds enter an account, every dollar already in the account becomes forfeitable "in its entirety" as property "involved in" money laundering. (ECF No. 60 at 14–17.) That per se rule is neither binding Ninth Circuit law nor consistent with § 1957's "criminally derived property" element, § 982's structure, or the Fourth Amendment's requirement of particularized probable cause.

1. Ninth Circuit law rejects presumptions that commingling alone makes property forfeitable. In *United States v. Rutgard*, the Ninth Circuit addressed § 1957 in the context of commingled accounts and expressly refused to adopt a presumption that transactions from a commingled account necessarily involve criminally derived property. 116 F.3d 1270, 1292 (9th Cir. 1997). Instead, the Government must prove that the transaction at issue involved criminally derived proceeds; commingling does not relieve that burden. *Id.*

Here, the Government does not identify any "monetary transaction" in which the

preexisting $277,210.34 deposit itself was used, transferred, or laundered. Nor does it identify any transaction in which the preexisting Coinbase BTC was used to purchase, conceal, or move alleged proceeds. Co-residence in an account is not a transaction, and it is not probable cause that the preexisting property was "involved in" a § 1957 offense.

2. Where tracing is impracticable, the remedy is substitute property—not pretrial seizure of clean funds. Courts confronting extensive commingling have recognized that the Government cannot simply forfeit (or seize) an entire account as "traceable to" proceeds. Rather, when commingling prevents tracing "without difficulty," the Government's remedy is a forfeiture money judgment and pursuit of substitute assets under 21 U.S.C. § 853(p). *See In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1212–15 (11th Cir. 2013); *United States v. Voigt*, 89 F.3d 1050, 1084–88 (3d Cir. 1996).

In the Ninth Circuit, substitute assets may not be restrained pretrial. *United States v. Ripinsky*, 20 F.3d 359, 363–65 (9th Cir. 1994). The Government's commingling theory would circumvent *Ripinsky* by allowing pretrial restraint of otherwise untainted property based solely on later deposits of alleged proceeds. The statute does not permit that result.

3. The Government's cited commingling cases are distinguishable and, in key respects, confirm the limits of its theory. The Government relies heavily on Fourth Circuit and Eastern District of Virginia authority, including *United States v. Kivanc*, 714 F.3d 782, 794–95 (4th Cir. 2013), and *United States v. Miller*, 295 F. Supp. 3d 690 (E.D. Va. 2018). But *Kivanc* was a civil forfeiture case addressing a jury instruction at trial, and it cited other circuits for the proposition that legitimate funds commingled with criminal proceeds may be forfeitable where the commingling was done to conceal the illegitimate funds. 714 F.3d at 794–95. *Miller* involved specific money-laundering transactions—payments exceeding $10,000 of criminal proceeds used to improve or pay obligations tied to real property—thereby using the property as a means of laundering. 295 F. Supp. 3d at 692–94, 697–98. Neither case stands for the proposition that identifiable, preexisting property that was not used in any

laundering transaction is automatically forfeitable merely because it was held in the same account.

The Government's citation to *United States v. Lindell*, No. 13-00512 DKW, 2016 WL 4707976 (D. Haw. Sept. 8, 2016), is likewise inapposite. *Lindell* addressed a different record and posture and did not endorse seizure of identifiable, preexisting clean funds based solely on later deposits.

## VI. RELIEF

For the foregoing reasons, Mr. Kupetz respectfully requests that the Court grant his Motion (ECF No. 54) and: (1) vacate the seizure warrants issued under § 853(f) and order the Government to return the seized property; or, in the alternative, (2) modify the seizures to immediately release the Government-identified preexisting, untainted property (including the $277,210.34 deposit in **Target Account 5** and the preexisting cryptocurrency valued at approximately $47,605.11 in **Target Account 6**), convert any remaining restraint to a narrowly tailored § 853(e) protective order served on the relevant institutions, and set a prompt adversarial hearing to test the Government's continued basis for restraining any property.

Dated: January 22, 2026

Respectfully submitted,

s/ *Ronald W. Chapman II*
Ronald W. Chapman II

*Attorney for Defendant Kupetz*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 22, 2026, I filed and served the foregoing document via the CM/ECF system with the Clerk of the Court and with counsel for Defendants Kontos, Kupetz, and Kinds.

s/ *Ronald W. Chapman II*
Ronald W. Chapman II